UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

JEAN JEUNE,

                         Plaintiff,                    **MEMORANDUM & ORDER**
                                                       16-CV-1107 (MKB)
                    v.

RUDOLPH F. CREW, JERALD POSMAN,
DONOVAN ALLEN and BRIAN CLARKE,

                         Defendants.

------------------------------------------------------------

CORY WRIGHT,

                         Plaintiff,

                    v.                                 16-CV-1108 (MKB)

RUDOLPH F. CREW, JERALD POSMAN and
ESTHER HUNDLEY,

                         Defendants.

------------------------------------------------------------

WILLIAM FULCHER,

                         Plaintiff,

                    v.                                 16-CV-2437 (MKB)

RUDOLPH F. CREW, GARY JOHNSON,
SYLVIA KINARD, TANYA E. ISAACS, JERALD
POSMAN, DONOVAN ALLEN, BRIAN
CLARKE and ESTHER HUNDLEY,

                         Defendants.

------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On March 5, 2016, Plaintiffs Jean Jeune and Cory Wright commenced the above-captioned actions with almost identical allegations against Defendants Rudolph F. Crew, Jerald Posman and Brian Clarke (the "Jeune Defendants") and Defendants Crew, Posman and Esther Hundley (the "Wright Defendants"), respectively. (Jeune Compl., Docket Entry No. 1; Wright Compl., Docket Entry No. 1.) Several months later, on May 12, 2016, Plaintiff William Fulcher commenced a similar action against Defendants Crew, Posman, Allen, Clarke, Hundley, Gary Johnson, Sylvia Kinard and Tanya E. Isaacs (the "Fulcher Defendants"). (Fulcher Compl., Docket Entry No. 1.)[1] Plaintiffs, current and former employees of the City University of New York ("CUNY"), bring their respective actions pursuant to 42 U.S.C. § 1983, alleging that Defendants, employees of CUNY during the relevant period, retaliated against Plaintiffs for exercising their First Amendment rights when they complained about defects in the construction of a building on CUNY's Medgar Evers College campus. (*See generally* Jeune Compl., Wright Compl, Fulcher Compl.) On March 20, 2016, Plaintiffs Jeune and Wright filed Amended Complaints. (Jeune Am. Compl., Docket Entry No. 5; Wright Am. Compl., Docket Entry No. 5.) After a pre-motion conference on June 17, 2016, Plaintiffs Jeune and Wright each filed a Second Amended Complaint ("SAC") and Plaintiff Fulcher filed an Amended Complaint. (Min. Entry dated June 17, 2016; Fulcher Am. Compl., Docket Entry No. 17; Jeune SAC, Docket Entry No. 18; Wright SAC, Docket Entry No. 16.)

---

[1] The Court refers to all three plaintiffs collectively as "Plaintiffs" and likewise refers to the Jeune Defendants, Wright Defendants and Fulcher Defendants collectively as "Defendants."

Defendants move to dismiss[2] the Jeune SAC with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and move to dismiss the Wright SAC and the Fulcher Amended Complaint with prejudice pursuant to Rules 12(b)(2), 12(b)(5) and 12(b)(6) of the Federal Rules of Civil Procedure.[3]  For the reasons discussed below, the Court: (1) grants the motion to dismiss the Jeune SAC with prejudice, (2) grants the motion to dismiss the Wright SAC with prejudice, and (3) grants the motion to dismiss the Fulcher Amended Complaint without prejudice as described further below.

## I. Background

The facts alleged in the Jeune SAC, Wright SAC and Fulcher Amended Complaint are assumed to be true for the purpose of deciding these motions, and, to the extent the facts between the complaints overlap, the Court cites to the Jeune SAC for ease of reference.

---

[2]  The Court consolidates the Jeune, Wright and Fulcher actions solely for purposes of deciding these motions.

[3]  (Jeune Defs. Mot. to Dismiss ("Jeune Defs. Mot."), Docket Entry No. 22; Jeune Defs. Mem. in Supp. of Jeune Defs. Mot. ("Jeune Defs. Mem."), Docket Entry No. 24; Decl. of William Taylor in Supp. of Jeune Defs. Mot. ("Jeune Defs. Taylor Decl."), Docket Entry No. 23; Jeune Defs. Reply in Further Supp. of Jeune Defs. Mot. ("Jeune Defs. Reply"), Docket Entry No. 25; Wright Defs. Mot. to Dismiss ("Wright Defs. Mot."), Docket Entry No. 20; Wright Defs. Mem. in Supp. of Wright Defs. Mot. ("Wright Defs. Mem."), Docket Entry No. 22; Decl. of William Taylor in Supp. of Wright Defs. Mot. ("Wright Defs. Taylor Decl."), Docket Entry No. 21; Wright Defs. Reply in Further Supp. of Wright Defs. Mot. ("Wright Defs. Reply"), Docket Entry No. 23; Fulcher Defs. Mot. to Dismiss ("Fulcher Defs. Mot."), Docket Entry No. 21; Fulcher Defs. Mem. in Supp. of Fulcher Defs. Mot. ("Fulcher Defs. Mem."), Docket Entry No. 23; Decl. of William Taylor in Supp. of Fulcher Defs. Mot. ("Fulcher Defs. Taylor Decl."), Docket Entry No. 22; Fulcher Defs. Reply in Further Supp. of Fulcher Defs. Mot. ("Fulcher Defs. Reply"), Docket Entry No. 24.)

### a.    Construction of the Administrative Building at Medgar Evers

In or around 2007, CUNY and the Dormitory Authority of the State of New York ("DASNY") began construction on a 190,000 square foot, five-story administrative building on Medgar Evers campus in Brooklyn, New York (the "Administrative Building").[4]  (Jeune SAC ¶ 14.)  CUNY financed the construction with City and State funds, at a final cost of approximately $247 million.  (*Id.* ¶ 17.)  In or around the spring of 2009, CUNY and DASNY hired Hudson Meridian ("Meridian"), a professional construction management firm, at a cost of more than one million dollars "to oversee the construction and turnover certification" of the Administrative Building.  (*Id.* ¶¶ 18–19.)[5]  The Administrative Building was completed and "fully commissioned" sometime in the fall of 2010.  (Wright SAC ¶ 37.)

According to Plaintiffs, Meridian:

> intentionally covered up fraud, corruption and waste of taxpayers' monies creating dangerous conditions within the life safety systems and other systems of the Administrative Building compromising the physical safety of employees, students and other stakeholders of the community . . . to increase profit for themselves and agents' of CUNY and DASNY.

(Jeune SAC ¶¶ 19–20.)  Defendant Hundley, a Public Safety Officer at Medgar Evers, was assigned to oversee Meridian, and, according to Plaintiffs, was "fully aware of the fraud, corruption and waste of taxpayers' monies and the serious safety deficiencies" within the Administrative Building.  (Jeune SAC ¶ 18; Wright SAC ¶ 36; Fulcher Am. Compl. ¶ 23.)  Plaintiffs allege that the Administrative Building is constructed in an "unsafe manner" and that

---

[4]  Although the parties quibble over the name of the building, (Jeune Defs. Mem. 3 n.4.; Wright Defs. Mem. 3 n.4; Fulcher Defs. Mem. 3 n.4; Jeune SAC ¶ 1; Wright SAC ¶ 1; Fulcher Am. Compl. ¶ 1), the Court refers to the building as identified by Plaintiffs.

[5]  The Jeune SAC contains two consecutive paragraphs numbered nineteen.  The Court construes the separate paragraphs as a single paragraph and refers to "¶ 19" when citing one or both of the paragraphs.

DASNY and CUNY must "shut it down for immediate repairs to its life safety systems and other systems." (Jeune SAC ¶ 21.)

Plaintiffs made "complaints" and "reports" to some unknown person or entity that "CUNY and DASNY, their agents and [their] vendor partners intentionally covered up fraud, corruption and waste of taxpayers' monies," which resulted in "dangerous conditions within the life safety system and other systems" of the Administrative Building.[6] (Jeune SAC ¶¶ 1, 13; Wright SAC ¶¶ 1, 13; Fulcher Am. Compl. ¶¶ 1, 13, 35.)

### b. Plaintiffs' job descriptions

From 2009 until 2015, Wright served as Chief Administrative Superintendent in the Facilities Management Department at Medgar Evers. (Wright SAC ¶¶ 1, 22, 112–13.) Wright's responsibilities included "overall management" of the personnel assigned to buildings and grounds as well as the maintenance of all Medgar Evers facilities. (*Id.* ¶ 23.)

Jeune was a Senior Stationary Engineer[7] in the Facilities Management Department at Medgar Evers until he was demoted in or around late 2015. (Jeune SAC ¶¶ 1, 11, 51–52.) The

---

[6] The complaints include many allegations regarding the deficiencies in the construction of the Administrative Building that are not related to Plaintiffs' alleged protected speech. The Court only includes the relevant allegations.

[7] Although Jeune indicates that he was a "Chief Engineer," (Jeune SAC ¶ 51), the Jeune Defendants argue that CUNY does not have a "Chief Engineer" position. (Jeune Defs. Mem. 3 n.2.) The Court takes judicial notice of the CUNY Classified Civil Service Position Description available online which states that the position of Senior Stationary Engineer is the highest engineering position available at a CUNY school as it provides no direct line of promotion. The City University of New York Classified Civil Service Position Description, Senior Stationary Engineer ("Senior Stationary Engineer Position Description"), (Oct. 9, 2015), http://www2.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/hr/classified-civil-service/ccsjobs/ST_Sen_Station_Eng_04916-rev-10-9-15-002.pdf; *see Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (noting that, in deciding a motion to dismiss for failure to state a claim, the court "may also look to public records"); *Lefebvre v. Morgan (Lefebvre I)*, --- F. Supp. 3d ---, ---, 2016 WL 1274584, at *13

responsibilities of a Senior Stationary Engineer include operating, maintaining, testing and repairing "all utilities in public buildings . . . , plant equipment such as . . . electrical equipment, heating and ventilating equipment, . . . mechanical, electrical, and plumbing equipment in University buildings;" as well as participating "in the review of DASNY plans for new and/or rehabilitation construction projects [by] providing comments and recommendations," training staff as to "the operation, maintenance and use of equipment and systems," and ensuring "compliance with all jurisdictional codes."[8]

Apart from the one-month period between March and April of 2015 when Fulcher held the position of Senior Stationary Engineer, Fulcher worked as a Stationary Engineer until CUNY terminated his employment on January 21, 2016.  (Fulcher Am. Compl. ¶¶ 1, 11, 37–38, 58.) The responsibilities of a Stationary Engineer include operating, maintaining, adjusting, testing

---

n.17 (S.D.N.Y. Mar. 31, 2016) (taking judicial notice of the New York State Department of Civil Service website for purposes of determining the employment classification of certain positions). In addition, because Jeune and Fulcher, have not alleged details regarding their respective job descriptions, the Court takes judicial notice of the CUNY Classified Civil Service Position Description of Senior Stationary Engineer as well as Stationary Engineer to determine the job duties for both positions.  *See, e.g.*, *Rissetto v. County of Clinton*, No. 15-CV-720, 2016 WL 4530473, at *20 n.88 (W.D.N.Y. Aug. 29, 2016) (taking judicial notice of the lieutenant job description posted on the Clinton County government's website for purposes of adjudicating a Rule 12(b)(6) motion as to the plaintiff's First Amendment retaliation claim where both parties appeared to have relied on the job description and the plaintiff did not object to the defendants' use of the job description or dispute its accuracy); *Hommel v. City of Long Beach*, No. 13-CV-3261, 2014 WL 1010654, at *3–4 (E.D.N.Y. Mar. 14, 2014) (taking judicial notice of the job description of Assistant Corporation Counsel for the City of Long Beach for purposes of adjudicating a Rule 12(b)(6) motion to dismiss the plaintiff's First Amendment retaliation claim).

[8]  *See* Senior Stationary Engineer Position Description, *supra* note 7.  This description of the job duties is consistent with Jeune's description in a letter opposing the Jeune Defendants' request for a pre-motion conference.  (Jeune Letter dated June 17, 2016, Docket Entry No. 23-3.) Jeune explained that he was "responsible for the operation, maintenance, and repair of all utilities within campus facilitates."  (*Id.*)

and repairing "fire protection systems, electro-mechanical building equipment and related auxiliary systems in public buildings," performing "periodic inspections of equipment and repairs of such equipment" and overseeing "preventive maintenance."[9]

### c. Wright's complaints and his termination

Prior to 2010, while the Administrative Building was under construction, Wright requested and was granted permission to access the Administrative Building. (Wright SAC ¶¶ 23, 37.) While inspecting the construction, "based on his training, education and experience," Wright noted "serious deficiencies within the mechanical, electrical, and plumbing systems that [could] only be explained as fraud, corruption and waste of taxpayers' monies," which deficiencies included missing air dampers, duct work, dedicated electrical services lines and dissimilar metal throughout the building. (*Id.* ¶¶ 24–25.) Wright "immediately forwarded these serious deficiencies" to the Medgar Evers Campus Planning Director at the time, Frank Tumminello, and Tumminello notified both CUNY and DASNY agents. (*Id.* ¶¶ 28–29.) After Wright shared the deficiencies with Tumminello, he was no longer allowed access to the construction site. (*Id.* ¶ 30.)

Separately, at an unidentified time, Wright became aware of "constant backups in the Franklin Avenue cellar ladies restroom" and "significant overflow problems." (*Id.* ¶¶ 76, 80.) He purchased a pipe camera and discovered a breach. (*Id.* ¶ 79.) Wright alleges the breach resulted from Richards Plumbing, the vendor partner hired by CUNY and DASNY, improperly connecting pipes "as a cost saving measure." (*Id.* ¶ 80.) Wright "raised" concerns regarding the

---

[9] The City University of New York Classified Civil Service Position Description, Stationary Engineer ("Stationary Engineer Position Description"), (July 8, 2003), http://www2.cuny.edu /wp-content/uploads/sites/4/page-assets/about/administration/offices/hr/classified-civil-service/classified-civil-service-job-descriptions/ST_Stationary_Engineer_04915.pdf.

overflow of water to CUNY and DASNY agents, and explained that "the flow of water will eventually erode the gas vapor barrier and cause gas to enter [the Administrative Building] compromising the health and safety of the occupants and other stakeholders." (*Id.* ¶ 81.)

On or about February 10, 2015, Wright went to the office of Defendant Crew, President of Medgar Evers, to "request a personal meeting with him to report fraud, corruption and waste of taxpayers' monies." (*Id.* ¶ 112.) Wright does not allege that he met with Crew or made any statements to Crew. "[S]hortly thereafter," Defendant Posman, the Senior Vice President and Chief Operating Officer, terminated Wright and told him that it was the "President's decision."[10] (*Id.* ¶¶ 12, 113.)

#### d. Jeune's and Fulcher's complaints and the subsequent employment actions against them

##### i. Complaints

###### 1. Jeune's and Fulcher's gas valve and carbon monoxide detector complaints

Jeune and Fulcher allege that the Administrative Building contained an "unsafe and volatile condition of leaking undetectable natural gas and carbon monoxide" because the "vendor partners intentionally installed defective gas valves within the laboratories" as well as "expired and defective gas sensors to increase . . . profits." (Jeune SAC ¶¶ 25, 34; Fulcher Am. Compl. ¶¶ 27, 41.) On May 1, 2015, CUNY hired an outside contractor from "R&D Group," who found that "numerous laboratory research and classrooms were equipped with expired and defective gas sensors." (Jeune SAC ¶ 33; Fulcher Am. Compl. ¶ 40.)

---

[10] Wright also alleges that Defendant Hundley "frequently complained" to Crew, about Wright and his Medgar Evers staff "in a concerted effort to have his employment terminated for exposing fraud, corruption, [and] waste of taxpayers' monies." (Wright SAC ¶¶ 12, 106.) Wright provides no further information about these complaints.

On or around June of 2015, Jeune and Fulcher informed Defendant Allen, the Assistant Vice President of Facilities Management, Campus Planning and Operations, "of the natural gas problem and the necessity to immediately repair the gas valve controls and gas sensors." (Jeune SAC ¶ 35; Fulcher Am. Compl. ¶ 43.) At an unidentified time, Jeune and Fulcher informed Allen and Defendant Clark, the Chief Administrative Superintendent of Buildings and Grounds, "about the defective natural gas and carbon monoxide sensors because these deficiencies pose a direct danger for the students, occupants and other stakeholders." (Jeune SAC ¶ 37; Fulcher Am. Compl. ¶ 45.) On July 1, 2015, CUNY hired a second contractor, ASCO, and ASCO "confirmed [that] there was a problem with the natural gas valves." (Jeune SAC ¶ 36; Fulcher Am. Compl. ¶ 44.) Despite the warnings from Jeune and Fulcher, on or around September 1, 2015, Allen ordered Jeune to "open the natural gas valves for classes." (Jeune SAC ¶ 38.)

### 2. Fulcher's DOL complaint

In or around August or September of 2015, Fulcher reported his "serious safety concerns about the defective gas valves" to DOL employee Kwo Iam.[11] (Fulcher Am. Compl. ¶ 46.)

### 3. Jeune's cooling tower complaint

On September 10, 2015, Jeune expressed "serious safety concerns" to Allen regarding the condition of the Administrative Building's cooling tower. (Jeune SAC ¶ 39.) On or about September 21, 2015, CUNY and DASNY hired a vendor partner "to test for the presence of Legionella bacteria[,] which was detected in one of the campus cooling towers." (*Id.* ¶ 40.)

---

[11] Fulcher fails to specify Iam's title or whether Iam worked for the New York State or federal department of labor. (*See* Fulcher Am. Comp. ¶ 46.)

### ii. Employment actions against Jeune and Fulcher

Sometime "shortly" after late September of 2015, the Jeune Defendants "abruptly demoted" Jeune from the Senior Stationary Engineer position and "charged him with misconduct after he allegedly performed a 'mutual'[12] without authorization" from Allen. (*Id.* ¶¶ 48, 51–52.)

In or around September of 2015, the Fulcher Defendants, with the exception of Hundley, changed Fulcher's work hours and denied his request for a reasonable accommodation to take care of his spouse. (Fulcher Am. Compl. ¶¶ 56–57.) Several months later, on January 21, 2016, the Fulcher Defendants, with the exception of Hundley, terminated Fulcher's employment due to "unsatisfactory job performance" even though Fulcher had a satisfactory evaluation. (*Id.* ¶ 58.)

At some unidentified time, Fulcher alleges that Isaacs, the Director of Human Resources/Labor Designee, did not "hire him from the established Engineers Examination list although he received a passing grade." (*Id.* ¶¶ 12, 35.) Fulcher does not specify the title of the position that he sought nor the date on which Isaacs failed to hire him.[13] According to Fulcher, Isaacs failed to hire him in retaliation for his complaints about "fraud, corruption, waste of monies and safety violation[s]." (*Id.* ¶ 35.) Fulcher wrote a letter to CUNY "in regards to being denied promotion to Senior Stationary Engineer."[14] (*Id.* ¶ 36.) Fulcher also alleges that he was denied overtime pay from in or around May of 2015 to July of 2015 in retaliation for "reporting" Isaacs to CUNY. (*Id.* ¶ 42.)

---

[12]  Neither side explains a "mutual."

[13]  It is unclear whether these allegations pertain to the failure to promote Fulcher to Senior Stationary Engineer or to some other position. (Fulcher Am. Compl. ¶¶ 36–38.)

[14]  In or around March of 2015, Plaintiff was promoted to Senior Stationary Engineer but approximately one month later, in or around April of 2015, Plaintiff was demoted from the position and "his probation was extended until March 2016." (*Id.* ¶¶ 37–39.)

## II.  Discussion

### a.  Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Concord Assocs., L.P. v. Entm't Prop. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

### b.  Service of process as to Hundley

The Wright and Fulcher Defendants argue that the Court lacks jurisdiction over Defendant Hundley because Plaintiffs have not served Hundley with the summons and the individuals served were not appointed or authorized to accept service on her behalf. (Wright Defs. Mem. 21–22; Fulcher Defs. Mem. 22–23.) Defendants also argue that Plaintiffs fail to state a claim against Hundley. (Wright Defs. Mem. 20–21; Fulcher Defs. Mem. 21–22.) Wright

and Fulcher do not address whether service was proper under federal or state law and instead argue that the service comported with due process because it was "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  (Wright Opp'n 1 n.1; Fulcher Opp'n 1 n.1.)

The Court finds it unnecessary to decide the jurisdictional issue of whether service of process was proper because, as discussed below, Plaintiffs' claims fail on the merits against all Defendants, including Hundley.  *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) ("[P]ersonal jurisdiction . . . is [not] fundamentally preliminary in the sense that subject-matter jurisdiction is, for [it is a] personal privilege[] of the defendant, rather than [an] absolute stricture[] on the court."); *United States v. Vazquez*, 145 F.3d 74, 80 & n.3 (2d Cir. 1998) (addressing the merits of the claims even though personal jurisdiction was not established due to lack of proper service because "the failure timely to serve a summons and complaint on the opposing party is excusable," and therefore it was "not an exercise of the hypothetical jurisdiction of the sort disapproved of by the Supreme Court" (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92–102 (1998))); *Taylor v. Westor Capital Grp.*, 943 F. Supp. 2d 397, 400 (S.D.N.Y. 2013) ("[D]ismissal under Rule 12(b)(6) renders unnecessary any further consideration of the parties' dispute over service of process under Rule 12(b)(5)." (collecting cases)); *see also Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 503 n.4 (S.D.N.Y. 2003) (addressing Rule 12(b)(5) motion first by noting that courts "may assume without deciding that the plaintiff properly has served the defendants in a timely manner" and then dismissing the case on the merits).

### c. First Amendment retaliation claims

Plaintiffs allege that because they reported safety concerns regarding defects in the construction of the Administrative Building, Defendants took adverse employment actions against them by, among other things, demoting Jeune and terminating Wright's and Fulcher's employment. (*See generally* Jeune SAC, Wright SAC, Fulcher Am. Compl.)

Defendants argue that Plaintiffs fail to state First Amendment retaliation claims because: (1) Plaintiffs did not speak as private citizens but rather, as public employees in the course of their regular job duties; and (2) even if their speech was protected speech, Plaintiffs fail to plausibly allege that there was a causal connection between the adverse actions they allege and any protected speech.[15] (Fulcher Defs. Mem. 9–19; Jeune Defs. Mem. 7–18; Wright Defs. Mem. 11–18.)

To state a First Amendment retaliation claim, a plaintiff must establish that: "(1) his speech or conduct was protected by the First Amendment; (2) the defendant took adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Matthews v. City of New* York, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v.*

---

[15] Defendants alternatively argue that they are entitled to qualified immunity. (Fulcher Defs. Mem. 19–21; Jeune Defs. Mem. 18–20; Wright Defs. Mem. 18–20.) Because the Court finds that Plaintiffs fail to allege that they engaged in protected speech, the Court does not consider whether Defendants are entitled to qualified immunity. *See Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) ("When a defendant officer . . . invokes qualified immunity . . . , a court must first consider [whether] . . . the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violate[d] a constitutional right[.] If the answer to this question is no, there is no necessity for further inquiries concerning qualified immunity." (internal quotation marks omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001))); *see also Powell v. City of New York*, No. 14-CV-9937, 2016 WL 4159897, at *11 (S.D.N.Y. July 14, 2016) ("There is no need to linger on the qualified immunity analysis in this case, since, as shown above, no constitutional violation can be made out, even on a favorable view of the parties' submissions." (internal quotation marks omitted) (quoting *Saucier*, 533 U.S. at 201)).

*Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)); *see also Eyshinskiy v. Kendall*, --- F. App'x ---, ---, 2017 WL 2829682, at *1 (2d Cir. June 30, 2017); *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008).

The Supreme Court has instructed courts to conduct a two-step inquiry into whether a public employee's speech is entitled to protection:

> The first [step] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question [then] becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Lane v. Franks*, 573 U.S. ---, ---, 134 S. Ct. 2369, 2378 (June 19, 2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

Thus, the First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if the employee speaks "[1] as a citizen [2] on a matter of public concern.'" *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (alterations in original) (quoting *Garcetti*, 547 U.S. at 418); *see also Eyshinskiy*, --- F. App'x at ---, 2017 WL 2829682, at *1 ("The first inquiry encompasses two separate questions: '(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee. If the answer to either question is no, that is the end of the matter.'" (quoting *Matthews*, 779 F.3d at 172)); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) ("[T]he plaintiff must show that . . . the speech at issue was made as

a citizen on matters of public concern rather than as an employee on matters of personal interest . . . ." (citation and internal quotation marks omitted)).[16]

Courts consider two sub-questions to determine whether an employee spoke as a citizen rather than an employee: (1) whether the speech falls outside of the employee's official responsibilities or duties and (2) whether a civilian analogue to the speech exists. *Matthews*, 779 F.3d at 173 (citation omitted). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Lane*, 573 U.S. at ---, 134 S. Ct. at 2376 (quoting *Garcetti*, 547 U.S. at 421). "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379; *see Monz v. Rocky Point Fire Dist.*, 519 F. App'x 724, 727 (2d Cir. 2013) (holding that expressions made pursuant to employee's official duties as captain of fire company were not constitutionally protected).

"Although a 'civilian analogue' to a government employee's speech militates in favor *of* an inference that the employee's speech is protected by the First Amendment, the presence *of* an unofficial analogue does not necessarily mean the speech is protected." *Cohn v. N.Y.C. Dep't of Educ.*, --- F. App'x ---, ---, 2017 WL 4162234, at *2 (2d Cir. Sept. 20, 2017) (citations omitted) (holding that even "if private citizens [could] complain to [the New York State Department of Education and the Board of Regents] in the same way [the plaintiff] did, it would not change [the Court's] conclusion that [the plaintiff's] speech was made pursuant to his official duties, and therefore unprotected by the First Amendment"); *Weintraub v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 593 F.3d 196, 204 (2d Cir. 2010) (Although the lack of a civilian analogue is "not

---

[16] The relevant inquiry in this case is whether Plaintiffs' speech was entitled to First Amendment protection because Plaintiffs spoke as a citizens, and, therefore, the Court does not discuss the applicable standard for determining whether speech is a matter of public concern.

dispositive," "it does bear on the perspective of the speaker — whether the public employee is speaking as a citizen — which is the central issue."); *Montero v. City of Yonkers*, 224 F. Supp. 3d 257, 269–70 (S.D.N.Y. 2016) (discussing that after *Matthews*, courts in the Second Circuit "are split" about whether the civilian analogue is a prerequisite to finding an employee's speech protected but concluding that the civilian analogue is not dispositive (collecting cases)).

In evaluating whether speech falls outside of an employee's official duties, courts utilize a functional approach. *Matthews*, 779 F.3d at 173; *Weintraub*, 593 F.3d at 202 ("The objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.'" (quoting *Garcetti*, 547 U.S. at 424)). The court must consider the "nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two. Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision." *Ross v. Breslin*, 693 F.3d 300, 306–07 (2d Cir. 2012) (holding that a payroll clerk's complaint to her supervisors and further "up the chain of command" regarding pay discrepancies was pursuant to her job responsibilities, which included "processing the payroll and making sure pay rates were correct").

Even if speech is not "required by, or included in, the employee's job description, or in response to a request by the employer," it may still be unprotected employee speech if the speech is "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203 (citation and internal quotation marks omitted) (holding that a teacher's complaint that a school administrator failed to discipline a student who had thrown a book at the teacher was "part-and-parcel" of the execution of his job duties "as a public school teacher — namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning"); *see also Matthews*, 779 F.3d at 174–75 (holding the

plaintiff's speech was protected where it expressed an opinion on a "precinct-wide policy," rather than a "specific violation[] of law," and it was "neither part of his job description nor part of the practical reality of his everyday work" to speak about or consider such policies); *Looney v. Black*, 702 F.3d 701, 712–13 (2d Cir. 2012) (holding that the plaintiff's "vague allegations . . . that, as the town employee who oversaw the entire 'organization and conduct of the building advisory, inspection and enforcement programs,' the alleged speech [to a town resident and the public regarding a wood burning boiler/stove and smoke discharge as public health concerns and his opinion regarding an outside agency enforcing a cease and desist order against [t]own residents] was closely related to his work as [b]uilding [o]fficial"); *Klaes v. Jamestown Bd. of Pub. Util.*, No. 11-CV-606, 2013 WL 1337188, at *16 (W.D.N.Y. Mar. 29, 2013) (finding that the engineer-plaintiff's complaints regarding safety violations were not protected speech where his complaints to his supervisors and other employees were "exclusively dedicated" to the division he was charged with monitoring and his duties included "enforc[ing] safety regulations").

A civilian analogue exists if the speech "is made through channels available to citizens generally." *Matthews*, 779 F.3d at 175; *Eyshinskiy*, --- F. App'x at ---, 2017 WL 2829682, at *1 (quoting *Matthews*, 779 F.3d at 175)). "[A]n indicium that speech by a public employee has a civilian analogue is that the employee's speech was to an independent state agency responsible for entertaining complaints by any citizen in a democratic society regardless of his status as a public employee." *Matthews*, 779 F.3d at 175 (citation omitted); *Weintraub*, 593 F.3d at 204 (The traditional examples of forms of speech with a civilian analogue are a "letter to an editor or a complaint to an elected representative or inspector general."); *see, e.g.*, *Eyshinskiy*, --- F. App'x at ---, 2017 WL 2829682, at *1 (holding that an assistant principal's complaints made through

the Department of Education's web application or directly to his supervisors did not have a

relevant civilian analogue); *Matthews*, 779 F.3d at 175–76 (finding a civilian analogue where a

police officer complained to precinct commanders who "regularly heard civilian complaints

about [p]recinct policing issues"); *Weintraub*, 593 F.3d at 204 (holding that "lodging of a union

grievance is not a form or channel of discourse available to non-employee citizens" because the

"internal communication" was made "pursuant to an existing dispute-resolution policy

established by [the plaintiff's] employer" rather than by "voicing his grievance through channels

available to citizens generally"); *Montero*, 224 F. Supp. 3d at 269 (finding that where the

plaintiff spoke at a meeting that did not allow "public access" and the complaint did not include

allegations "suggesting that public citizens could have aired their grievances" at the meeting, the

plaintiff's speech did not have a civilian analogue); *Ross v. N.Y.C. Dep't of Educ. (Ross Dep't of

Educ.)*, 935 F. Supp. 2d 508, 519–22, 521 n.12 (E.D.N.Y. 2013) (noting that "the court is not

convinced that there is a civilian analogue" to a teacher's OSHA complaint because he engaged

in a form of complaint only available to employees).

### i. Plaintiffs fail to state a First Amendment retaliation claim

Despite drawing all inferences in Plaintiffs' favor, with the exception of Fulcher's

complaint to a DOL employee, Plaintiffs' respective complaints fail to allege "more than a vague

set of circumstances regarding speech which necessarily owed its existence to" their respective

roles at Medgar Evers, and therefore Plaintiffs have not adequately alleged that they spoke as

citizens rather than as public employees. *Looney*, 702 F.3d at 713 (citation and internal

quotation marks omitted). The Court first addresses Plaintiffs' allegations that they complained

of "fraud, corruption and waste of taxpayers' monies," and then addresses each Plaintiff's individual allegations.[17]

### 1. Unspecified "fraud, corruption and waste of taxpayers' monies"

Plaintiffs each allege that they "report[ed]" to some unknown person or entity that "CUNY and DASNY, their agents' and [their] vendor partners intentionally covered up fraud, corruption and waste of taxpayers' monies." (Jeune SAC ¶¶ 1, 13; Wright SAC ¶¶ 1, 13; Fulcher Am. Compl. ¶¶ 1, 13, 35.)

These allegations are too conclusory to allege protected speech. There are no alleged facts to substantiate the complaints regarding "fraud, corruption and waste of taxpayers' monies"

---

[17] Wright and Fulcher fail to state a claim against Hundley. Wright and Fulcher allege that Hundley was "fully aware of the fraud, corruption and waste of taxpayers' monies and the serious safety deficiencies" within the Administrative Building. (Wright SAC ¶ 36; Fulcher Am. Compl. ¶ 23.) Wright also alleges that Hundley "frequently complained" to Crew about Wright and his Medgar Evers staff "in a concerted effort to have his employment terminated for exposing fraud, corruption, waste of taxpayers' monies." (Wright SAC ¶ 106.) These allegations are insufficient to allege Hundley's personal involvement — the allegation that Hundley was aware of complaints by Fulcher and Wright relating to "fraud, corruption and waste of taxpayers' monies" is conclusory, and similarly, the allegation that Hundley's complaint to Crew evidences Hundley's "concerted effort to have [Wright's] employment terminated" is mere speculation without any supporting facts. *See Doe v. City of New York*, No. 11-CV-3978, 2011 WL 3876990, at *2 (E.D.N.Y. Sept. 1, 2011) ("[A]ny complaint under [s]ection 1983 must plead *specific facts* that allege the personal involvement of each individual charged with violating [the plaintiff's] civil rights." (emphasis added) (citation omitted)). Moreover, Fulcher specifically excludes Hundley when listing the Defendants who allegedly retaliated against him. (*See, e.g.*, Fulcher Am. Compl. ¶¶ 56–57.) Accordingly, because there are no allegations in the Complaints that Hundley took any retaliatory action against Plaintiffs, the Court dismisses the claims against Hundley. *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016); *Costello v. City of Burlington*, 632 F.3d 41, 48–49 (2d Cir. 2011) (affirming the district court's dismissal of a First Amendment claim brought under section 1983 against certain defendants because the plaintiff failed to "allege facts establishing the personal involvement" of those defendants); *Holmes v. Poskanzer*, 342 F. App'x 651, 653 (2d Cir. 2009) (affirming the district court's decision dismissing a First Amendment retaliation claim because the plaintiffs did not allege "personal involvement of any of the defendants").

and there are no alleged facts to support the inference that Plaintiffs actually made these complaints, or to whom Plaintiffs made the complaints. *See Iqbal*, 556 U.S. at 678 (holding that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to defeat a motion to dismiss); *Irwin v. W. Irondequoit Cent. Sch. Dist.*, No. 16-CV-6028, 2017 WL 881850, at *6 (W.D.N.Y. Mar. 2, 2017) (denying a motion to amend a complaint to add a First Amendment retaliation claim because the facts were "too vague and speculative" as the plaintiffs "did not identif[y] the protected speech . . . let alone any speech or conduct at all"); *Clark v. Dominique*, 798 F. Supp. 2d 390, 403 (N.D.N.Y. 2011) (dismissing a First Amendment retaliation claim consisting of only "vague factual predicates and conclusory labels" where the plaintiff "without any meaningful detail" alleged that "she was terminated in 'retaliation for whistleblowing, and reporting and documenting what [she] believed were illegal acts on the part of the employer'"); *Thomas v. N.Y.C. Dep't of Educ.*, No. 09-CV-5167, 2011 WL 1225972, at *13 (E.D.N.Y. Mar. 29, 2011) (dismissing a First Amendment retaliation claim for failure to state a claim where the plaintiffs alleged that they exercised their First Amendment rights "to oppose defendants' illegal acts of creating false reports and covering up other wrongdoing in their school" but did not describe any statements made by the plaintiffs or specify to whom any statements were made); *Winters v. Meyer*, 442 F. Supp. 2d 82, 87 (S.D.N.Y. 2006) (dismissing a First Amendment retaliation claim where the plaintiff failed to plead any facts to support her claim that her speech was protected).

Plaintiffs' argument that their speech is protected under *Matthews* is unavailing. In *Matthews*, the police officer plaintiff made detailed allegations that the NYPD retaliated against him because he complained to several NYPD captains and an unnamed precinct executive officer

about an arrest, summons, and stop-and-frisk quota system implemented in his precinct.[18] *Matthews*, 779 F.3d at 169. The Second Circuit held that Matthews spoke as a private citizen because: (1) Matthews' speech expressed an opinion on a "precinct-wide policy," rather than a "specific violation[] of law," and it was "neither part of his job description nor part of the practical reality of his everyday work" to speak about or consider such policies; and (2) Matthews "chose a path that was available to ordinary citizens who are regularly provided the opportunity to raise issues with the precinct commanders." *Matthews*, 779 F.3d at 174–176.

Plaintiffs' conclusory allegations that they complained of "fraud, corruption and waste of taxpayers' monies" does not transform their otherwise unprotected employee speech into speech protected under *Matthews*. Unlike in *Matthews*, where the plaintiff complained of a precise precinct-wide policy even though it was not part of his job duties or everyday work to comment on such a policy, *id.* at 169 (the plaintiff complained that police officers were "under pressure to comply with" "a quota system mandating the number of arrests, summons, and stop-and-frisks that police officers must conduct" and "a point system that awarded points to police officers for issuing . . . good summonses and subtracted points for less desirable summonses" (internal quotation marks omitted)), Plaintiffs' only non-conclusory allegations are that they made complaints about specific Administrative Building deficiencies, for example, the gas valves, gas and carbon monoxide detectors, the water cooling towers and plumbing, (Jeune SAC ¶¶ 35, 37, 39; Fulcher Am. Compl. ¶¶ 43, 45–46; Wright SAC ¶¶ 28–29, 81), which complaints, as discussed in detail below, were part-and-parcel of their job duties and responsibilities in their

---

[18] The Second Circuit initially reversed the district court's order dismissing the case on a 12(b)(6) motion, holding that the record in the case was not sufficiently developed "to determine as a matter of law whether Officer Matthews spoke pursuant to his official duties when he voiced the complaints." *Matthews v. City of New York*, 488 F. App'x 532, 533 (2d Cir. 2012).

respective roles as Senior Stationary Engineer, Stationary Engineer and Chief Administrative Superintendent. *Cf. Matthews*, 779 F.3d at 174–75 (Matthews' speech expressed an opinion on a "precinct-wide policy," rather than a "specific violation[] of law," and it was "neither part of his job description nor part of the practical reality of his everyday work" to speak about or consider such policies); *see also Harisch v. Goldberg*, No. 14-CV-9503, 2016 WL 1181711, at *8 (S.D.N.Y. Mar. 25, 2016) (distinguishing *Matthews* in part because the plaintiff "was flagging specific violations of law and rules," which was part of his duty as a police lieutenant, "rather than discussing a department-wide policy" as the plaintiff in *Matthews*); *Micillo v. N.Y.C. Dep't of Educ.*, No. 14-CV-943, 2015 WL 915270, at *2 (S.D.N.Y. Mar. 3, 2015) (finding that the plaintiff's claim fell "well outside *Matthews'* ambit" because the alleged speech "did not implicate the implementation or formulation of any policy that transcended the scope of [the plaintiff's] duties" but only included speech about "specific wrongdoing by specific individuals related to his official job responsibility") (adopting report and recommendation).

### 2. Wright's complaints

Wright alleges that he engaged in protected speech when he requested a meeting with Crew and when he complained about the Administrative Building's construction deficiencies. (Wright SAC ¶¶ 28–29, 37, 81, 112.) During the relevant period, Wright was the Chief Administrative Superintendent at Medgar Evers and in that role he was responsible for "the overall management of the personnel assigned to buildings and grounds as well as the maintenance of all [Medgar Evers] facilities." (Wright SAC ¶ 22.)

### A. Meeting with Crew

Wright alleges that he went to Crew's office to request a personal meeting with Crew, the president of Medgar Evers, to complain about fraud, corruption and waste of taxpayers' money,

(Wright SAC ¶ 112), but he does not allege that he met or spoke with Crew. *See, e.g.*, *Davis v. N.Y.C. Dep't/Bd. of Educ.*, No. 14-CV-2281, 2015 WL 5772204, at \*9 (E.D.N.Y. Aug. 19, 2015) (recommending dismissal of a First Amendment retaliation claim where the plaintiff "d[id] not describe any specific statements, nor specify to whom any statements were made or under what circumstances"), *report and recommendation adopted*, 2015 WL 5772204 (E.D.N.Y. Sept. 29, 2015); *Anand v. N.Y. State Dep't of Taxation and Fin.*, No. 10-CV-5142, 2012 WL 2357720, at \*9 (E.D.N.Y. June 18, 2012) (dismissing a First Amendment retaliation claim because the "amended complaint d[id] not adequately describe the speech at issue, the subsequent adverse employment decision, or the individuals involved in that decision"). Even if such a meeting did occur, Wright fails to establish that his speech was protected because he does not specify the content of his speech and instead only alleges vague and conclusory statements that he intended to report "fraud, corruption and waste of taxpayers' monies." *See Iqbal*, 556 U.S. at 678; *see, e.g.*, *Irwin*, 2017 WL 881850, at \*6; *Clark*, 798 F. Supp. 2d at 403; *Thomas*, 2011 WL 1225972, at \*13.

### B. Complaints about construction deficiencies

Wright's complaints about construction deficiencies at the Administrative Building are unprotected speech because the complaints were made pursuant to his job duties and responsibilities, or, at the very least, were "part-and-parcel of his concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203 (citations omitted).

At some time prior to the completion of the Administrative Building in 2010, Wright alleges that he noticed "serious deficiencies within the mechanical, electrical, and plumbing systems that [could] only be explained as fraud, corruption and waste of taxpayers' monies," which deficiencies included missing air dampers, duct work, dedicated electrical services lines

and dissimilar metal throughout the building.  (*Id.* ¶¶ 23–25, 37.)  Wright "immediately forwarded these serious deficiencies" to the former Medgar Evers Campus Planning Director, Tumminello, who in turn shared the concerns with agents of CUNY and DASNY.  (*Id.* ¶¶ 28–29.)  Wright also alleges that he discovered a breach in plumbing caused by a construction shortcut taken as "a cost saving measure," which caused an overflow of water.  (*Id.* ¶¶ 79–80.)  At an unidentified time, Wright reported to agents of CUNY and DASNY his concern that the overflow of water resulting from the breach might result in "gas contamination" in the Administrative Building, which posed a safety and health right to students.  (*Id.* ¶ 81.)

Wright was responsible for "the overall management of the personnel assigned to buildings and grounds as well as the maintenance of all [Medgar Evers] facilities," (Wright SAC ¶ 22), and reporting the structural facility deficiencies is precisely the type of complaint that falls within Wright's duty to maintain Medgar Evers' facilities.  *See, e.g.*, *Looney*, 702 F.3d at 713 ("[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." (quoting *Garcetti*, 547 U.S. at 424–25)); *Langton v. Town of Chester*, 168 F. Supp. 3d 597, 605 (S.D.N.Y. 2016) (dismissing a First Amendment retaliation claim where the alleged protected speech "squarely concern[ed] the management, or mismanagement, of the library, and it is precisely these type of critiques and analyses that [the] [p]laintiff was charged with generating as a library trustee"); *Micillo*, 2015 WL 915270, at *2 (rejecting the argument that because a job description did not include reporting time-card fraud, the plaintiff who was responsible for "collecting and submitting payroll" spoke as a private citizen when reporting such fraud).

In addition, to the extent the allegations identify to whom Wright made his complaints, he exclusively identifies fellow CUNY employees and/or agents of DASNY, which further demonstrates that his complaints were made pursuant to his duties and responsibilities as the manager of the facilities at Medgar Evers.[19]  *See Ross*, 693 F.3d at 307 ("Taking a complaint up the chain of command to find someone who will take it seriously does not, without more, transform [the] speech into protected speech made as a private citizen." (citation and internal quotation marks omitted)); *Harisch*, 2016 WL 1181711, at *7–8 (finding that the secrecy of a

---

[19]  Even if Wright's speech is protected speech, his First Amendment claim nevertheless fails because he fails to allege that the Wright Defendants had any knowledge of the speech such that the Court could infer retaliatory animus.  Wright's allegation regarding his concern that the overflow of water resulting from the breach might result in "gas contamination" in the Administrative Building, which posed a safety and health risk to students, (Wright SAC ¶ 81), does not specify when or to whom he raised these concerns.  Similarly, Wright's allegation that he forwarded various deficiencies he noticed during the construction of the Administrative Building to former Medgar Evers Campus Planning Director, Tumminello, and that Tumminello forwarded the concerns to agents of CUNY and DASNY, fails to identify any of the CUNY or DASNY agents as any of the Wright Defendants and fails to allege that any of the Wright Defendants had knowledge of the forwarded concerns.  *See Wrobel v. County of Erie*, 692 F.3d 22, 32 (2d Cir. 2012) ("[I]t is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct." (internal quotation marks omitted)); *see, e.g., Cresci v. Mohawk Valley Cmty. Coll.*, --- F. App'x ---, ---, 2017 WL 2392470, at *2 (2d Cir. June 2, 2017) (affirming a district court's dismissal of a First Amendment retaliation claim where the plaintiff "failed to allege facts from which the court could infer that [the defendant] was aware of any such protected speech"); *Wu v. Metro-North Commuter R.R.*, No. 14-CV-7015, 2015 WL 5567043, at *7 (S.D.N.Y. Sept. 22, 2015) ("[The] [p]laintiff has not pleaded any facts that would suggest that [the] [d]efendant [] even had any knowledge of these complaints, rendering baseless any inference that he might have been motivated to retaliate for them."); *Ehrlich v. Dep't of Educ. of City of N.Y.*, No. 11-CV-4114, 2012 WL 424991, at *4 (S.D.N.Y. Feb. 6, 2012) (dismissing a First Amendment retaliation claim for failure to allege causation where the plaintiff did "not specify where, when, or how any of the alleged speech (complaints) or adverse actions took place, or whether [the individual defendants] even knew of [the plaintiff's] complaints").

meeting where the plaintiff's speech occurred "further indicate[d] that the speakers at the meeting were not speaking as citizens").[20]

Accordingly, Wright's speech was not protected because he spoke pursuant to his official duties and responsibilities as the manager of facilities.

### 3. Jeune and Fulcher complaints

Jeune and Fulcher allege that Defendants retaliated against them because: (1) Fulcher complained about CUNY's failure to hire or promote him; (2) they both complained to Allen and Clarke that the Administrative Building had faulty gas valves and carbon monoxide detectors and Jeune complained to Allen about issues with the Administrative Building's cooling tower; and (3) Fulcher complained to a DOL employee about the faulty gas valves. (Jeune SAC ¶¶ 35, 39; Fulcher Am. Compl. ¶¶ 12, 36, 43, 46.) At the time of the alleged protected speech, Jeune and Fulcher held positions as Senior Stationary Engineer and Stationary Engineer, respectively. (Jeune SAC ¶ 51; Fulcher Am. Compl. ¶¶ 37–39.)

### A. Fulcher's claims against Isaacs

Fulcher alleges that after he was denied the promotion to Senior Stationary Engineer, presumably by Isaacs, he wrote a letter to CUNY regarding the denial and he was subsequently

---

[20] In addition, there is no civilian analogue to Wright's speech. Even though there are insufficient allegations to determine with whom Wright shared his complaints, he appears to have made complaints only to individuals employed by CUNY or DASNY and there are no allegations that the individuals to whom he complained were tasked with accepting civilian complaints. *See Eyshinskiy v. Kendall*, --- F. App'x ---, ---, 2017 WL 2829682, at *2 (2d Cir. June 30, 2017) (holding an assistant principal's complaints made through the Department of Education's web application or directly to his supervisors did not have a relevant civilian analogue); *Medina v. Dep't of Educ. of City of N.Y.*, No. 10-CV-1180, 2011 WL 280800, at *3 (S.D.N.Y. Jan. 14, 2011) ("Plaintiff was only in a position to raise these concerns to [the school principal, his union representatives and parents of the students] as a direct result of his position as a guidance counselor."); *cf. Matthews v. City of New* York, 779 F.3d 167, 176 (2d Cir. 2015) (finding a civilian analogue to the plaintiff's speech where he spoke to police precinct commanders who were regularly available to the public to hear citizen complaints).

denied overtime pay from in or about May of 2015 to July of 2015 in retaliation for "reporting" Isaacs to CUNY.  (*Id.* ¶¶ 36–39, 42.)

The Court dismisses this allegation because Fulcher's complaint to CUNY that Isaacs failed to hire him was a personal grievance about the denial of his promotion request, and is therefore not protected speech.  *See Gordon v. City of New York*, 612 F. App'x 629, 631 (2d Cir. 2015) ("Among the relevant considerations in deciding if speech addresses a matter of public concern 'is whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.'" (quoting *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013))); *Golodner v. Berliner*, 770 F.3d 196, 204 (2d Cir. 2014) ("[T]he 'First Amendment does not protect all private ventings of disgruntled public employees.'" (quoting *Singer*, 711 F.3d at 340)); *Lefebvre v. Morgan (Lefebvre II)*, 234 F. Supp. 3d 445, 454 n.3 (S.D.N.Y. 2017) (explaining that allegations based on the filling of multiple "grievance reports" relating to the conditions of the plaintiff's employment cannot form the basis of a First Amendment retaliation claim).  In addition, because Fulcher fails to allege whether it was Isaacs or any other Fulcher Defendant who denied his request for overtime pay, Fulcher has not shown that Isaacs engaged in retaliatory conduct.  *See Richard v. Fischer*, 38 F. Supp. 3d 340, 358 (W.D.N.Y. 2014) (dismissing a First Amendment retaliation claim against certain defendants for failure to allege that they engaged in the retaliatory acts of filing false disciplinary reports).

### B.   Jeune's and Fulcher' complaints to Allen and Clarke

Jeune and Fulcher allege that in or around June of 2015, they reported to Allen that a "natural gas problem" with the Administrative Building required immediate repair of the gas valves, (Jeune SAC ¶ 35, Fulcher Am. Compl. ¶ 43), and at an unidentified time, they reported deficiencies with the natural gas and carbon monoxide sensors to Allen and Clarke, (Jeune SAC

¶ 37; Fulcher Am. Compl. ¶ 45). Separately, Jeune alleges that on September 10, 2015, he expressed new safety concerns to Allen regarding the condition of the Administrative Building's cooling tower. (Jeune SAC ¶ 39.)

As Senior Stationary Engineer, Jeune's responsibilities included operating, maintaining, testing and repairing "all utilities in public buildings . . . [and] plant equipment such as . . . electrical equipment, heating and ventilating equipment, . . . mechanical, electrical, and plumbing equipment in University buildings;" and ensuring "compliance with all jurisdictional codes." Similarly, Fulcher's responsibilities as Stationary Engineer included operating, maintaining, adjusting, testing and repairing "fire protection systems, electro-mechanical building equipment and related auxiliary systems in public buildings," performing "periodic inspections of equipment and repairs of such equipment" and performing and overseeing "preventive maintenance."[21]

Jeune's and Fulcher's complaints about the "natural gas problem" requiring immediate repair of the gas valves and the deficiencies with the natural gas and carbon monoxide sensors fall squarely within their duties and responsibilities; the complaints concern maintaining and repairing "equipment and systems," ensuring "compliance with all jurisdictional codes," completing "periodic inspections of equipment and repairs of such equipment" and performing "preventive maintenance."[22] Indeed, Jeune's and Fulcher's complaints to Allen regarding the

---

[21] *See* Senior Stationary Engineer Position Description, *supra* note 7; Stationary Engineer Position Description, *supra* note 9.

[22] *See* Senior Stationary Engineer Position Description, *supra* note 7; Stationary Engineer Position Description, *supra* note 9.

gas valves asked for a particular remedy — the immediate repair of the valves, (Jeune SAC ¶ 35; Fulcher Am. Compl. ¶ 43), a task that they were responsible for overseeing.

Jeune's complaint to Allen regarding the Administrative Building's cooling tower is similar in nature to Jeune's and Fulcher's complaints about the gas valves and gas and carbon monoxide sensors and also falls within his duties and responsibilities. Jeune had supervisory authority over "the operation, maintenance and use of equipment and systems," and ensuring "compliance with all jurisdictional codes," which compliance would necessarily include ensuring that unspecified "serious safety concerns" about the Administrative Building's cooling tower are addressed.[23] *See, e.g.*, *Langton*, 168 F. Supp. 3d at 605 (dismissing a First Amendment retaliation claim where the alleged protected speech "squarely concern[ed] the management, or mismanagement, of the library, and it is precisely these type of critiques and analyses that [the] [p]laintiff was charged with generating as a library trustee").

The public employee nature of Jeune's and Fulcher's complaints is further demonstrated by the fact that they complained to employees with similar or supervisory duties and responsibilities. Jeune and Fulcher shared their complaints exclusively with Defendants Allen and Clarke, both of whom worked in facilities and building management at Medgar Evers. (Jeune SAC ¶¶ 35, 37, 39; Fulcher Am. Compl. ¶¶ 43, 45.) Allen, the Assistance Vice President of Facilities Management, Campus Planning and Operations, and Clarke, the Chief Administrative Superintendent of Buildings and Grounds, both of whom appear to have been

---

[23] *See* Senior Stationary Engineer Position Description, *supra* note 7.

senior to Jeune[24] and Fulcher, in their respective roles as Senior Stationary Engineer and Stationary Engineer.[25]  Therefore, Jeune and Fulcher only reported up the chain of command, and as such, their complaints were public employee speech.  *See Cohn*, --- F. App'x at ---, 2017 WL 4162234, at \*2 (holding that speech by a teacher to his "immediate supervisors (the principal and assistance principal)" and to state educational officials was speech as a public employee because taking a complaint "up the chain of command," without more, does not transform public employee speech into private citizen speech (quoting *Ross*, 693 F.3d at 307)); *see, e.g.*, *Klaes*, 2013 WL 1337188, at \*16 (finding that the engineer-plaintiff's complaints regarding safety violations were not protected speech where his complaints to his supervisors and other employees were "exclusively dedicated" to the division he was charged with monitoring and his duties included "enforc[ing] safety regulations").  The "only sensible way to interpret" Jeune's and Fulcher's speech is that they spoke to Allen and Clarke about the gas valves and gas and carbon monoxide sensors and the cooling tower "because [they were] in an official position that

---

[24] (Jeune SAC ¶ 38 ("[O]n or about September 1, 2015 [D]efendant [] Allen ordered [Jeune] to manually open the natural gas values for classes."); *id.* ¶ 52 (alleging that Jeune was disciplined for performing "a 'mutual' without authorization [] Allen").)

[25] As Chief Administrative Superintendent of Building and Grounds, Clarke, held a "management class" position under executive direction, "with the widest latitude for the exercise of independent judgment and action."  His responsibilities include directing the work of the Administrative Superintendents of Campus Buildings and Grounds which is also a management class position that is responsible for directing "buildings and grounds staff in all repair, maintenance, and improvements involving major and minor alterations."  *See* The City University of New York Classified Civil Service Position Description, Chief Administrative Superintendent of Building and Grounds, (July 20, 2000), http://www2.cuny.edu/wp-content/upl oads/sites/4/page-assets/about/administration/offices/hr/classified-civil-service/classified-civil-se rvice-job-descriptions/BNG_Chief_Adm_Sup_Build_Grounds_04984.pdf; The City University of New York Classified Civil Service Position Description, Administrative Superintendent of Building and Grounds, (Aug. 26, 2013), https://www.cuny.edu/about/administration/offices/ohr m/hros/classification/ccsjobs/04975AdministrativeSuperintendentofBuildingandGrounds.pdf.

required, or at least allowed, [them] to do so," *Looney*, 702 F.3d at 712, and accordingly, their speech was "part-and-parcel of [their] concerns about [their] ability to properly execute [their] duties," *Weintraub*, 593 F.3d at 203 (citations omitted).[26]

### C. Fulcher's DOL complaint

Fulcher alleges that in or around August or September of 2015, he met with DOL employee Kwo Iam to express "serious safety concerns about the defective gas valves," (Fulcher Am. Compl. ¶ 46). Fulcher does not include any additional allegations regarding the substance or context of his speech to Iam or Iam's duties and responsibilities. Fulcher also alleges that the Fulcher Defendants retaliated against him in September of 2015 when they collectively, with the exception of Hundley, changed his work hours and denied his request for a reasonable accommodation to take care of his spouse, (*id.* ¶¶ 56–57), and on January 21, 2016, the same

---

[26] In addition, there is no civilian analogue to Jeune's and Fulcher's complaints to Allen and Clarke, both of whom are Medgar Evers employees, and, like Plaintiffs, work in facilities management and buildings and grounds, respectively. *See Eyshinskiy*, --- F. App'x at ---, 2017 WL 2829682, at *2; *Rissetto v. County of Clinton*, No. 15-CV-720, 2016 WL 4530473, at *20 (W.D.N.Y. Aug. 29, 2016) ("[The plaintiff] 'voiced' his 'concerns' to two individuals in his chain of command [], but [p]laintiffs do not allege facts plausibly suggesting that he directed those concerns to any other channels, outside agencies, or public officials."); *Harisch v. Goldberg*, No. 14-CV-9503, 2016 WL 1181711, at *7–8 (S.D.N.Y. Mar. 25, 2016) (finding that speech regarding "illegal accounting for time" when the plaintiff was in charge of scheduling was unprotected, even though it was made to the town administrator in a "secret" meeting rather than to his immediate supervisors); *cf. Matthews*, 779 F.3d at 176 (holding that a police officer's complaints to precinct commanders satisfied the civilian analogue because the commanders were regularly available to the public to hear citizen complaints). Plaintiffs do not allege that Allen and Clarke regularly "met with members of the community" or otherwise engaged with citizens about matters concerning construction on the Medgar Evers campus. *See, e.g.*, *Montero v. City of Yonkers*, 224 F. Supp. 3d 257, 269 (S.D.N.Y. 2016) (finding that where the plaintiff spoke at a meeting that did not allow "public access" and the complaint did not include allegations "suggesting that public citizens could have aired their grievances" at the meeting, the plaintiff's speech did not have a civilian analogue).

group of Defendants terminated his employment due to "unsatisfactory job performance" even though Fulcher had a satisfactory evaluation, (*id.* ¶ 58).

### (1) Protected speech

Although the subject-matter of Fulcher's speech to the DOL employee is the same as his speech to Allen, (*see* Fulcher Am. Compl. ¶¶ 1, 11, 37–38, 58), because the complaint was made to an employee of an outside agency, here the DOL,[27] rather than to a CUNY employee, the nature of his speech is not necessarily the same as his complaints to Allen and Clarke.[28]

Choosing to complain through a channel outside of the work place does not automatically transform Fulcher's speech that is otherwise part-and-parcel of his job duties and responsibilities

---

[27] The DOL, whether state or federal, is tasked with the protection of worker wages and safety and the assistance of the unemployed. *See* Our Services, New York State Department of Labor, https://labor.ny.gov/about/services.shtm (last visited Sept. 16, 2017) ("The mission of the New York State Department of Labor is to protect workers, assist the unemployed, and connect job seekers to jobs."); Our Mission, United States Department of Labor, https://www.dol.gov/gen eral/aboutdol/mission (last visited Sept. 16, 2017) ("To foster, promote, and develop the welfare of the wage earners, job seekers, and retirees of the United States; improve working conditions; advance opportunities for profitable employment; and assure work-related benefits and rights."). The Court takes judicial notice of the mission statements of the New York and United States Departments of Labor. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, No. 14-CV-9783, 2015 WL 5122590, at *7 (S.D.N.Y. Aug. 31, 2015) (stating that it is "clearly proper for to take judicial notice" of "documents retrieved from official government websites" and that "[c]ourts routinely take judicial notice of such governmental records").

[28] *See* Stationary Engineer Position Description, *supra* note 9.

into private-citizen speech,[29] but it does make the speech more citizen-like.[30]  Courts that have

considered complaints made to an entity charged with the protection of worker's safety have

reached varying conclusions as to whether the speech was protected; the courts considered it

relevant whether the complaints were made as part or in furtherance of the employee's duties and

whether only employees, as opposed to private citizens, could make similar complaints to the

agency.  *See Catanzaro v. City of New York*, 486 F. App'x 899, 902 (2d Cir. 2012) (declining to

decide if the complaint to PESH made by the plaintiffs, who were employees of the City of New

York's Division of Emergency Response and Technical Assistance Unit, was made pursuant to

---

[29]  *See e.g.*, *Looney v. Black*, 702 F.3d 701, 713 (2d Cir. 2012) (holding that vague
allegations of speech by a town building official to a town resident regarding an issue within the
scope of his responsibilities was made within the course of his official duties); *Ross v. Breslin*,
693 F.3d 300, 307 (2d Cir. 2012) (whether "speech was unprotected does not rest on the fact that
[the] speech was made in the workplace as opposed to elsewhere . . . [c]ourts must focus their
inquiry on the nature of the speech itself and its relationship to the plaintiff's job
responsibilities"); *Ross v. New York City Dep't of Educ. (Ross Dep't of Educ.)*, 935 F. Supp. 2d
508, 519–22 (E.D.N.Y. 2013) (granting summary judgment to the defendants on a teacher's
claim that his OSHA complaint was protected speech, in part because, "even if there is a civilian
analogue," the plaintiff clearly complained as an employee rather than a citizen and the plaintiff
was speaking "pursuant to his official duties as a physical education teacher").

[30]  *See Eyshinskiy*, --- F. App'x at ---, 2017 WL 2829682, at *1 (holding that a complaint
"to an independent state agency responsible for entertaining complaints by any citizen in a
democratic society" is an "indicium that speech by a public employee has a civilian analogue"
(quoting *Matthews*, 779 F.3d at 175)); *Catanzaro v. City of New York*, 486 F. App'x 899, 902
(2d Cir. 2012) (holding that "external complaints" to Public Employee Safety and Health Bureau
("PESH") as opposed to "internal complaints" raised "different questions about the scope of [the
plaintiffs'] official duties" and declining to decide whether the speech was protected because the
plaintiffs failed to establish causation); *Carter v. Inc. Village of Ocean Beach*, 693 F. Supp. 2d
203, 211 (E.D.N.Y. 2010) (When a "public employee takes his job concerns to persons outside
the work place in addition to raising them up the chain of command at his workplace, [] those
external communications are *ordinarily* not made as an employee, but as a citizen." (emphasis
added) (citation omitted)); *see, e.g.*, *Murray v. Coleman*, No. 08-CV-6383, 2014 WL 2993748, at
*4 (W.D.N.Y. July 2, 2014) ("[The] [p]laintiff did not just direct his complaints to his supervisor
s, up the chain of command.  He also wrote to the New York State governor, and to his represent
atives in the state legislature and in Congress.  Though that alone is not dispositive of whether
his speech was protected, it is some indication that it is entitled to First Amendment
protection.").

their official duties, and noting that the PESH complaint "rais[ed] different questions about the scope" of their official duties than their internal complaints to supervisors); *Krzesaj v. N.Y.C. Dep't of Educ.*, No. 16-CV-2926, 2017 WL 1031278, at *8 n.13 (S.D.N.Y. Mar. 15, 2017) (finding that a physical education teacher failed to state a First Amendment retaliation claim based on his PESH and Occupational Safety and Health Administration ("OSHA") complaints, which the court found were made pursuant to his role as a teacher because those agencies provide "a vehicle specifically for public employees to report health and safety violations, and [the p]laintiff alleges no facts that would allow the [c]ourt to find otherwise" but noting that there is not a clear consensus within the Circuit regarding whether such complaints can be made as a private citizen (collecting cases)); *Manon v. Pons*, 131 F. Supp. 3d 219, 231 (S.D.N.Y. 2015) (finding that complaints made to PESH by the plaintiff, a clerical associate, that her worksite operated by the City Taxi and Limousine Commission had only one exit, which caused a substantial risk to safety and the air quality in the facility and was a health hazard, fell outside of the "purview of her responsibilities" because speech that extends "beyond [the employee's] ability to perform her functions on a day-to-day basis into the realm of how the agency of which she is a part should be run" is often protected); *see generally Ross Dep't of Educ.*, 935 F. Supp. 2d at 520–21, 521 n.12 (considering the following factors on a summary judgment motion in deciding that a teacher's OSHA complaint was not protected speech: (1) he testified that he made the complaint "*because of* his duties as an educator;" (2) he stressed his identity as a teacher in the OSHA complaint, which "one would imagine that he would not have stressed" if he spoke as a private citizen; and (3) he clearly invoked OSHA's employee-complaint channels rather than non-employee channels).

Where, as here, the Court has no details regarding the nature or context of the complaint to the DOL employee, the DOL employee's title or responsibilities, or more facts regarding Fulcher's ordinary safety reporting responsibilities, the Court cannot determine whether reporting to the DOL was part of Fulcher's duties, and therefore, cannot determine the nature of Fulcher's speech.[31] *See Matthews v. City of New York*, 488 F. App'x 532, 533 (2d Cir. 2012) (holding that the record in the case was not sufficiently developed "to determine as a matter of law whether Officer Matthews spoke pursuant to his official duties when he voiced the complaints," and allowing the case to proceed to discovery); *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-7833, 2012 WL 3890599, at *4–8 (S.D.N.Y. Sept. 6, 2012) ("Absent a more detailed record of the content and circumstances of [the plaintiff's] speech, the [c]ourt cannot say, as a matter of law, that her speech was as an employee rather than a citizen and that Defendants are entitled to prevail as a matter of law on her First Amendment claim.").[32]

---

[31] The Fulcher Defendants' reliance on *Gwozdz v. Genesis Physician Services*, No. 13-CV-317, 2014 WL 943116 (D. Conn. Mar. 11, 2014), to argue that the complaint to the DOL is not protected speech is misplaced because the plaintiff's complaint in *Gwozdz* "owed [its] existence to her job duties and [was] made in furtherance of those duties." *Gwozdz*, 2014 WL 943116, at *3–4. In contrast, the facts alleged in Fulcher's Amended Complaint are insufficiently developed to allow the Court to determine whether it was part of his job duties to report unsafe working conditions to the DOL, or the content of the speech shared with the DOL.

[32] Because the Fulcher Defendants do not appear to challenge that Fulcher's speech relates to a matter of public concern, the Court does not consider whether Fulcher spoke on a matter of public concern. In addition, the Court cannot determine at this preliminary stage whether the Fulcher Defendants are entitled to qualified immunity based on Fulcher's complaint to the DOL employee because of the unknown facts and circumstances surrounding Fulcher's complaint. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017) ("[W]hen a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010))); *Birch v. City of New York*, 184 F. Supp. 3d 21, 28 (E.D.N.Y. 2016) ("[T]he availability of qualified immunity is often fact-intensive, and if facts

## (2) Causation

While it is unclear whether Fulcher's complaint to the DOL employee was speech made as a private citizen, Fulcher's claim nevertheless fails because Fulcher fails to allege the necessary causal relationship between the DOL complaint and any retaliatory acts by the Fulcher Defendants.

Fulcher made the DOL complaint in August or September of 2015. (Fulcher Am. Compl. ¶ 46.) At the end of September of 2015, approximately one month after Fulcher's allegedly protected speech, certain of the Fulcher Defendants changed Fulcher's work hours and denied his request for a reasonable accommodation to take care of his spouse, and approximately four months later, on January 21, 2016, terminated his employment. (Fulcher Am. Compl. ¶¶ 46, 56–58.)

Although Fulcher's allegation as to the timing of his DOL complaint, as it relates to the denial of his request for reasonable accommodation, change in work hours and termination, suggests that there may be a causal connection based on temporal proximity, because Fulcher does not allege that any of the Defendants were aware of his complaint to the DOL, the Court cannot infer that these actions were motivated even in part by retaliatory animus. Fulcher therefore fails to state a First Amendment retaliation claim regarding his complaint to the DOL. *See Wrobel v. County of Erie*, 692 F.3d 22, 32 (2d Cir. 2012) ("[I]t is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be

---

are in dispute, a court may need to have a jury resolve them before it can decide whether qualified immunity bars a plaintiff's claim, or, at least, it may require a full record on a motion for summary judgment to determine if there is a factual issue." (first citing *Southerland v. City of New York*, 680 F.3d 127, 161 (2d Cir. 2012); and then citing *Bendel v. Westchester Cty. Health Care Corp.*, 112 F. Supp. 2d 324, 329 (S.D.N.Y. 2000))).

aware of the protected conduct." (internal quotation marks omitted)); *see, e.g.*, *Cresci v. Mohawk Valley Cmty. Coll.*, --- F. App'x ---, ---, 2017 WL 2392470, at *2 (2d Cir. June 2, 2017) (affirming a district court's dismissal of a First Amendment retaliation claim where the plaintiff "failed to allege facts from which the court could infer that [the defendant] was aware of any such protected speech"); *Wu v. Metro-North Commuter R.R.*, No. 14-CV-7015, 2015 WL 5567043, at *6–7 (S.D.N.Y. Sept. 22, 2015) (dismissing claims on a Rule 12(b)(6) motion because the plaintiff had "not pleaded any facts that would suggest that [the] [d]efendant [] even had any knowledge of these complaints, rendering baseless any inference that he might have been motivated to retaliate for them"); *Ehrlich v. Dep't of Educ. of City of N.Y.*, No. 11-CV-4114, 2012 WL 424991, at *4 (S.D.N.Y. Feb. 6, 2012) (dismissing a First Amendment retaliation claim for failure to allege causation where the plaintiff did "not specify where, when, or how any of the alleged speech (complaints) or adverse actions took place, or whether [the individual defendants] even knew of [the plaintiff's] complaints"); *cf. Odermatt v. N.Y.C. Dep't of Educ.*, --- F. App'x ---, ---, 2017 WL 2378196, at *2 (2d Cir. June 1, 2017) (holding that the plaintiff sufficiently alleged causation because it was "at least plausible" that the defendant "was aware of the email [containing the allegedly protected speech] and that removing [the plaintiff] was motivated by [the speech]" as the email was sent to the same address that defendant used to notify the plaintiff of the adverse action two days later).

Accordingly, for the reasons discussed above, Plaintiffs fail to state a First Amendment retaliation claim.

### ii.    Dismissal with prejudice

Defendants argue that the Court should dismiss the complaints with prejudice.  (Jeune Defs. Mem. 1; Wright Defs. Mem. 1; Fulcher Defs. Mem. 1.)  Plaintiffs have not requested the opportunity to amend their complaints.

"When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."  *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *see also Caren v. Collins*, --- F. App'x ---, ---, 2017 WL 3587488, at *3 (2d Cir. Aug. 21, 2017) ("[D]ismissal for insufficient pleadings are ordinarily with leave to replead . . . ." (quotation omitted)).  "However, where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." *Hayden*, 180 F.3d at 53; *see also TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint."); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (holding that the district court did not err in dismissing the claims with prejudice "[i]n the absence of any indication that [the plaintiff] could — or would — provide additional allegations that might lead to a different result").

Courts are especially cautious of allowing a plaintiff multiple attempts to amend a complaint.  *See, e.g.*, *Neal v. Town of E. Haven*, --- F. App'x ---, ---, 2017 WL 3225638, at *2 (2d Cir. July 31, 2017) ("We further conclude that the [d]istrict [c]ourt acted within its discretion in dismissing the amended complaint with prejudice, in view of the fact that, after [the plaintiff's] original complaint was dismissed, he received leave to amend and failed to cure the original complaint's inadequacies."); *Offor v. Mercy Med. Ctr.*, 676 F. App'x 51, 54 (2d Cir.

2017) ("[The plaintiff] amended her original complaint once, and moved to amend the complaint again after [the] defendants had filed a motion to dismiss. The district court did not abuse its discretion in dismissing the complaint with prejudice and denying her a fourth attempt."); *Montero*, 224 F. Supp. at 274–75 (dismissing a complaint with prejudice where the plaintiff had already amended the complaint and there "is no reason to suspect that, given another opportunity to amend, [the] [p]laintiff will be able to cure the substantive deficiencies"); *Anthony v. Brockway*, No. 15-CV-451, 2015 WL 5773402, at *3 (N.D.N.Y. Sept. 30, 2015) ("[The] [p]laintiff has already been given one opportunity to amend his complaint . . . , and there is nothing in his second amended complaint suggesting that [he] could do better given another opportunity.").

Here, allowing Fulcher a third attempt, and Jeune and Wright a fourth attempt, to plead a First Amendment retaliation claim as to all of their allegations would be a waste of judicial resources, and accordingly all but one of Plaintiffs' claims are dismissed with prejudice. Plaintiffs previously amended their complaints after a pre-motion conference where the Court discussed the deficiencies in Plaintiffs' complaints, (Min. Entry dated June 17, 2016), but as discussed above, they failed to cure the deficiencies.

The Court is not convinced based on the various iterations of the complaints that, if given another chance to amend, Plaintiffs would be able to cure the substantive deficiency of their First Amendment retaliation claims. Allowing an additional amendment, to parties that are and have been represented by counsel since the inception of this litigation, would be too generous. *See, e.g.*, *Lefebvre II*, 234 F. Supp. 3d at 461 (granting a motion to dismiss with prejudice where the plaintiff had already benefited from two amended complaints, the first in response to a decision on the merits, and still failed to state a claim); *see, e.g.*, *Panzella v. City of Newburgh*, 231

F. Supp. 3d 1, 10 n.4 (S.D.N.Y. 2017) (dismissing claims with prejudice where the plaintiffs had already amended their complaint once in response to the defendant's pre-motion conference letter).

Moreover, Plaintiffs have not requested leave to amend their respective complaints, nor have they argued that any dismissal should be without prejudice, and the Court need not grant unsolicited leave to amend. *See, e.g.*, *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125–26 (2d Cir. 2013) ("While leave to amend under the Federal Rules of Civil Procedure is freely granted, no court can be said to have erred in failing to grant a request that was not made." (citations and internal quotation marks omitted)); *see also Bastuk v. County of Monroe*, 628 F. App'x 4, 7 (2d Cir. 2015) ("While represented by counsel in the district court, [the plaintiff] never requested leave to amend his complaint" and "the district court did not abuse its discretion here" by dismissing the complaint with prejudice. (citation omitted)); *cf. Cresci*, --- F. App'x at ---, 2017 WL 2392470, at *3 (holding that the district court erred in dismissing the initial complaint with prejudice because the plaintiff requested leave to amend and the plaintiff should not have been required to file a proposed amended complaint until the court granted the motion to dismiss).

However, the Court denies without prejudice Fulcher's First Amendment retaliation claim based on the allegation that he complained to a DOL representative and allegedly was retaliated against as a result of that complaint.[33] Fulcher must allege the personal involvement of any Defendant named in any amended pleading.

---

[33] Fulcher specifically alleges that Crew, Johnson, Kinard Isaacs, Posman, Allen and Clarke made the adverse employment decisions to change his work hours, deny his request for a reasonable accommodation and terminate his employment but Fulcher excludes Hundley from this list, (*see, e.g.*, Fulcher Am. Compl. ¶¶ 56–57), and for that reason there is no basis for any amended complaint by Fulcher against Hundley.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motions to dismiss the Jeune and Wright SACs and Fulcher Amended Complaint with prejudice as to all claims except Fulcher's claim that Fulcher Defendants retaliated against him for speaking to a DOL employee. Fulcher shall file a second amended complaint within thirty (30) days of this Memorandum and Order. If Fulcher fails to file a second amended complaint within the time specified, the Court will dismiss Fulcher's action with prejudice for the reasons set forth above.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 29, 2017
      Brooklyn, New York